The COCA–COLA COMPANY
et al., Petitioners,

v.

HARMAR BOTTLING COMPANY
et al., Respondents.

No. 03–0737.

Supreme Court of Texas.

Argued Nov. 9, 2004.

Decided Oct. 20, 2006.

Rehearing Denied May 4, 2007.

**674**

Robert Harrison Pemberton, Austin, Orrin L. Harrison III, David Ray McAtee, Akin Gump Strauss Hauer & Feld LLP, Tyler A. Baker, Jeffrey S. Levinger, Joshua A. Imhoff, Carrington Coleman Sloman & Blumenthal, LLP, Dallas, Kenneth L. Glazer, Bryan R. Henry, Albert C. Loebe, Atlanta, GA, Jonathan M. Jacobson, Akin Gump Strauss Hauer & Feld LLP, New York, NY, Kay Lynn Brumbaugh, Jerry L. Beane, Andrews Kurth LLP, and P. Michael Jung, Strasburger & Price, L.L.P., Dallas, for Petitioner.

Jeffrey J. Angelovich, Nix Patterson & Roach, Daingerfield, William A. Durham, Eastham, Watson, Dale & Forney, Warren W. Harris, Bracewell & Giuliani, LLP, Jacalyn Ann Hollabaugh, Karen Ann Lister, Bracewell & Patterson, L.L.P., Houston, C. Cary Patterson, Nelson J. Roach, Nix Law Firm, Daingerfield, and Thomas M. Stanley, Law Office of Thomas M. Stanley, Houston, for Respondent.

R. Glen Rigby, Pillsbury Winthrop LLP, Houston, David M. Gunn, David J. Beck, John Sidney Adcock, Beck, Redden & Secrest, L.L.P., Houston, TX, Kenneth W. Starr, Robert R. Gasaway, Elizabeth S. Petrela and Jennifer S. Atkins, Kirkland & Ellis LLP, Washington, DC, John J. Park,

Jr., Office of Atty. Gen., Montgomery, AL, for Amicus Curiae.

Justice HECHT delivered the opinion of the Court, in which Justice WAINWRIGHT, Justice GREEN, Justice JOHNSON, and Justice WILLETT joined.

Five carbonated soft drink bottlers with franchises to distribute Royal Crown Cola in various territories within the Ark–La–Tex region (a four state region including parts of Arkansas, Louisiana, and Texas where the three borders meet, and also nearby southeast Oklahoma) sued The Coca–Cola Company and several distributers of both Coca–Cola and Dr Pepper in the same area for using calendar marketing agreements ("CMAs") with retailers to unreasonably restrain trade, monopolize the market, and attempt and conspire to monopolize the market in violation of the Texas Free Enterprise and Antitrust Act of 1983 ("TFEAA")[1] and the antitrust laws of the other three states. The district court rendered judgment on the jury's verdict for the plaintiffs, awarding damages incurred throughout the region and permanently enjoining, in specified counties in each of the four states, certain conduct that it determined to be anticompetitive. The court of appeals affirmed.[2]

We address two issues. One is whether Texas courts can adjudicate and remedy an anticompetitive injury occurring in another state, either under the TFEAA or the law of that state. We hold that the TFEAA will not support extraterritorial relief in the absence of a showing that such relief promotes competition in Texas or benefits Texas consumers. We also hold that Texas courts, as a matter of interstate comity, will not decide how another state's antitrust laws and policies

---

**1.** Tex. Bus. & Com.Code §§ 15.01–.26 (Act of May 26, 1983, 68th Leg., R.S., ch. 519, 1983 Tex. Gen. Laws 3009, as amended).

**2.** 111 S.W.3d 287 (Tex.App.-Texarkana 2003).

apply to injuries confined to that state. The other issue is whether the plaintiffs have shown substantial harm, real or threatened, to competition in the relevant market as a result of the defendants' conduct. We conclude that there is no evidence of such harm and that the lack of evidence is fatal to all of the plaintiffs' claims. Accordingly, we reverse the judgment of the court of appeals, dismiss the plaintiffs' claims of injury occurring in other states, and render judgment that the plaintiffs take nothing on their claims of injury occurring in Texas.

## I

Coca–Cola, Dr Pepper, Pepsi–Cola, Royal Crown Cola, and other carbonated soft drinks ("CSDs") are distributed wholesale by "bottlers" and sold retail to the public in supermarkets, convenience stores, small grocery stores, and other outlets. In the Ark–La–Tex region in the 1990s, the Coca–Cola bottler, Coca–Cola Enterprises, Inc., and five of its affiliates[3] (collectively "CCE") also distributed Dr Pepper and held about 75–80 percent of the market for nationally branded CSDs.[4] (Worldwide, Coca–Cola Enterprises, Inc. was responsible for 77 percent of Coca–Cola sales.) The Pepsi–Cola bottler had about 13–15 percent of the market, leaving five Royal Crown Cola franchisees with the remainder. Each of the five RCC franchisees was restricted to operating in an assigned territory,[5] some of which overlapped: one, Harmar Bottling Company, in Texas and Oklahoma;[6] two, O–Mc Beverages, Inc. and Bolls' Distributing Co., in Texas and Arkansas;[7] one, Hackett Beverages, Inc., in Arkansas only;[8] and one, Royal Crown Bottling Co., in Louisiana only.[9] None of the five operated entirely within Texas, and two operated entirely outside Texas.

These five RCC franchisees sued CCE and The Coca–Cola Company, which manufactures Coca–Cola (collectively, "Coke"), complaining of their use of CMAs with CSD retailers in the territories plaintiffs

**3.** Coca–Cola Bottling Co. of North Texas, Ouachita Coca–Cola Bottling Co., Inc., Coca–Cola Bottling Co. of Shreveport, Paris Coca–Cola Bottling Co., Inc., and Sulphur Springs Coca–Cola Bottling Co., Inc.

**4.** The RCC franchisees define the relevant product market to include all nationally branded CSDs sold at all retail outlets. Nationally branded CSDs are major labels such as Coca–Cola, Pepsi, and RC, in contrast to private labels, which are bottled for specific retailers and sold as store brands. The RCC franchisees further define the market geographically according to the territorial boundaries of the distributors, such that the exclusive territory of each distributor is a separate market. For the purposes of this opinion, we accept the franchisees' definition of the relevant markets.

**5.** *See generally* Soft Drink Interbrand Competition Act, 15 U.S.C. §§ 3501–3503 (permitting exclusive territory licenses for soft drink bottlers).

**6.** Harmar Bottling Company's territory consisted of 9 Texas counties (Camp, Delta, Fannin, Franklin, Hopkins, Lamar, Morris, Red River, and Titus) and 3 Oklahoma counties (Choctaw, McCurtain, and Pushmataha).

**7.** O–Mc Beverages, Inc.'s territory consisted of 6 Texas counties (Bowie, Camp, Cass, Franklin, Morris, and Titus) and 9 Arkansas counties (Clark, Hempstead, Howard, Lafayette, Little River, Miller, Nevada, Pike, and Sevier). Bolls' Distributing Co.'s territory consisted of 2 Texas counties (Bowie and Cass) and 11 Arkansas counties (Cleveland, Columbia, Hempstead, Howard, Lafayette, Little River, Miller, Nevada, Ouachita, Sevier, and Union).

**8.** Hackett Beverages, Inc.'s territory consisted of 8 Arkansas counties (Ashley, Bradley, Calhoun, Chicot, Dallas, Desha, Drew, and Lincoln).

**9.** Royal Crown Bottling Co.'s territory consisted of 5 Louisiana parishes (Bossier, Caddo, DeSoto, Red River, and Webster).

served. (The RCC franchisees also sued the manufacturer of Pepsi–Cola, the Pepsi–Cola Company, its parent, Pepsico, Inc., and two bottlers, but these defendants settled before trial, and therefore we do not discuss the allegations against them.) Generally speaking, a CMA provides that during stated periods of time a retailer will promote a wholesaler's products in preference to competing products in exchange for payments and price discounts from the wholesaler.

For CSDs, price and prominent retail display are critical marketing factors. Thus, the promotional preferences called for in CMAs used by CSD wholesalers include outside and in-store advertising, prominently located displays in "impulse zones" such as near checkout stands where purchase decisions are often made, enlarged shelf and cooler space, and reduced prices. Typically, CMAs do not prohibit retailers from selling competing products but do require more favorable promotion of the wholesaler's products and limited or no promotion of competing products. CMAs may also require retailers to price the wholesaler's products below competing products, even if the differential is achieved by pricing competing products higher than they otherwise would be. CMAs typically cover only specific time periods during the year, not the entire year, and are terminable at will by either the retailer or the wholesaler. Retailers receive price discounts and direct payments and bonuses for their promotional efforts.

The RCC franchisees concede, as they must, that CMAs are used throughout the country and have repeatedly withstood antitrust challenges,[10] and that CMAs, including CMAs previously used by Coke, are not in themselves anti-competitive. But they complain that Coke used CCE's dominant position in the Ark–La–Tex region aggressively to negotiate CMAs with terms that suppressed competition from other bottlers. Specifically, the RCC franchisees complain, and the evidence shows, that in the Ark–La–Tex region:

- Coke had CMAs with most retailers, including virtually every major retailer other than Wal–Mart, since most could not afford to refuse a CMA with Coke given the market dominance of Coca–Cola and Dr Pepper.
- Coke's CMAs generally covered 42–52 weeks per year, even though their CMAs in other areas often covered only 26 weeks.
- Coke's CMAs prohibited or limited retailer advertising of competing national brands during the covered periods.

---

**10.** *See, e.g., El Aguila Food Prods. Inc. v. Gruma Corp.,* 131 Fed.Appx. 450 (5th Cir. 2005), *aff'g* 301 F.Supp.2d 612, 628–632 (S.D.Tex.2003); *R.J. Reynolds Tobacco Co. v. Philip Morris USA,* 67 Fed.Appx. 810, 811–812 (4th Cir.2003), *aff'g* 199 F.Supp.2d 362 (M.D.N.C.2002); *Bayou Bottling Inc. v. Dr. Pepper Co.,* 725 F.2d 300, 304 (5th Cir.1984); *Louisa Coca–Cola Bottling Co. v. Pepsi–Cola Metro. Bottling Co.,* 94 F.Supp.2d 804 (E.D.Ky.1999); *Frito–Lay, Inc. v. Bachman Co.,* 659 F.Supp. 1129, 1134 (S.D.N.Y.1986); *Beverage Mgmt., Inc. v. Coca–Cola Bottling Corp.,* 653 F.Supp. 1144 (S.D.Ohio 1986). *But cf. Conwood Co., L.P. v. U.S. Tobacco Co.,* 290 F.3d 768 (6th Cir.2002) (jury finding of a violation of section 2 of the Sherman Act was supported by evidence showing that USTC systematically tried to exclude competition from the moist snuff market by: (1) removing, destroying or discarding racks that displayed other moist snuff products while hiding plaintiff's products in USTC racks; (2) training USTC operatives to take advantage of store clerk inattention and various ruses to "reorganize" the moist snuff section; (3) misusing its position as category manager by providing misleading information to retailers in an effort to dupe them into carrying USTC products and to discontinue carrying plaintiff's products; and (4) entering into exclusive agreements with retailers in an effort to exclude rivals' products).

- Coke's CMAs sometimes required retailers to price featured packages (six-pack cans, for example) below competing products during a promotional period, or to always price certain packages below competing products (sometimes requiring prices as much as 30 cents less per ounce), even when competitors' wholesale prices were below CCE's, so that retailers had to charge higher prices for competing products than they otherwise would have in order to comply with the CMAs.
- For a few retailers, Coke's CMAs paid bonuses for not carrying competitive flavors of root beer and orange and grape drinks at all, thus driving competing products from stores in some areas and allowing CCE to raise the prices of its drinks.
- CCE increased its prices at times in some locations, even though sales were increasing.
- Some of Coke's CMAs required that in refrigeration units its products be displayed in horizontal sets at thigh-to-eye level so as to be most easily seen by consumers, and that no other refrigerated products be located near a store check-out area.
- Although Coke did not require retailers to give its products more shelf space, refrigerated area, or floor displays than was commensurate with its 75–80 percent share of the CSD market, it sometimes required that part of that space be used for soft drinks sold by CCE that had no market share at all (like Barq's Root Beer (versus A & W), Minute Maid orange and grape

- drinks (versus Sunkist and Welch's), and Sprite (versus 7–Up)). This left little space for competing drinks.
- Because of the limited retail display space, the RCC franchisees could not introduce two other products, RC Edge and Diet Rite, into the market without diverting space already occupied by their other products.
- Bottlers had no difficulty getting shelf space at Wal–Mart, where there were no Coke CMAs, and Coca–Cola often sold for more than competing CSDs, reflecting the difference in the wholesale prices.

An economist testified for the RCC franchisees that Coke's use of CCE's market share to force retailers into CMAs inhibited competition and negatively impacted the RCC franchisees' sales.[11] He also testified that Coke was monopolizing or attempting to monopolize the CSD markets served by the parties and, if left unchecked, would succeed.[12] But he offered no opinion on how the CMAs affected price and output in any relevant market as a whole [13] and made no attempt to quantify to what extent, if at all, Coke had foreclosed competition in the relevant markets.

Coke offered evidence that the promotional efforts encouraged by their CMAs resulted in higher volumes of CSDs sold and lower prices generally, that the RCC franchisees' products were available in all areas to any consumers who wanted them, and that the RCC franchisees could have attempted to negotiate CMAs with retailers or increase their own promotional efforts but intentionally chose not to do so.

**11.** 111 S.W.3d 287, 299–300, 314–315 (Tex. App.-Texarkana 2003).

**12.** *Id.*

**13.** Brief for Respondents at 21–22, n. 10 (stating that although respondents do not admit the absence of proof of market foreclosure, their expert "testified that *he* was not evaluating the effects of Coke's practices on price or output").

There was also evidence that CCE competed vigorously with the Pepsi–Cola bottlers. But the jury found none of this evidence persuasive.

The RCC franchisees alleged that throughout the 1990s Coke had engaged in an unreasonable restraint of trade and had monopolized, attempted to monopolize, and conspired to monopolize the CSD market in their exclusive territories in the Ark–La–Tex region, all in violation of the TFEAA[14] and the antitrust laws of Arkansas, Louisiana, and Oklahoma. Coke did not dispute the RCC franchisees' assertion that the laws of the other three states were identical to Texas law, and accordingly the district court presumed they were. The court did not define the relevant geographic market for the jury but instructed the jury that they could consider various factors in determining the relevant market or markets. The jury found that CCE had engaged in monopolization or attempted monopolization, that CCE and The Coca–Cola Company had engaged in an unreasonable restraint of trade and a conspiracy to monopolize, that CCE and The Coca–Cola Company had acted willfully or flagrantly, and that in so doing CCE and The Coca–Cola Company had wrongfully interfered with the RCC franchisees' existing and future business relationships with retailers. The jury was asked to find actual damages for both antitrust and tortious interference claims, including past and future lost profits and lost franchise value, separately as to each of the five RCC franchisees. For the three operating in two states, the verdict did not distinguish between damages incurred inside and outside Texas. The court trebled the total actual antitrust damages of $5,153,898.80 as required by statute,[15] credited $817,000 paid by the Pepsi defendants in settlement, and rendered judgment against Coke for $14,644,696.40, plus $500,000.00 attorney fees. The court also enjoined Coke from prohibiting any retailer from engaging in any form of advertisement or promotion of any nationally branded CSD, prohibiting any retailer from displaying or placing cold equipment for any nationally branded CSD, prohibiting any retailer from selling any nationally branded CSD or flavor, requiring or suggesting that any retailer use horizontal sets, or requiring or suggesting any retailer use a ratio to allocate space in cold equipment, through any contract or incentive program, in any county or parish where the RCC franchisees operated, in Arkansas, Louisiana, Oklahoma, and Texas, for a period of seven

**14.** Tex. Bus. & Com.Code § 15.05(a)-(b)("(a) Every contract, combination, or conspiracy in restraint of trade or commerce is unlawful. (b) It is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce.").

**15.** *Id.* § 15.21(a)(1) ("Any person ... whose business or property has been injured by reason of any conduct declared unlawful in Subsection (a), (b), or (c) of Section 15.05 of this Act may sue any person ... in district court in any county of this state in which any of the named defendants resides, does business, or maintains its principal office or in any county in which any of the named plaintiffs resided at the time the cause of action or any part thereof arose and shall recover actual damages sustained, interest on actual damages for the period beginning on the date of service of such person's pleading setting forth a claim under the antitrust laws and ending on the date of judgment (the rate of such interest to be in accordance with Texas law regarding postjudgment interest rates and the amount of interest to be adjusted by the court if it finds that the award of all or part of such interest is unjust in the circumstances), and the cost of suit, including a reasonable attorney's fee; provided, however, that if the trier of fact finds that the unlawful conduct was willful or flagrant, it shall increase the recovery to threefold the damages sustained and the cost of suit, including a reasonable attorney's fee; provided that interest on actual damages as specified above may not be recovered when recovered damages are increased threefold.").

years. The text of this broad and detailed injunction is set out in the appendix.[16]

The court of appeals affirmed.[17] It rejected Coke's argument that the district court should not have awarded damages and injunctive relief under the TFEAA for conduct that occurred outside Texas. Quoting from section 15.04 of the Act, the Court concluded that "[t]he language of the Texas statute is clear in its intent to cover monopolistic practices in commerce 'occurring wholly or partly within the State of Texas.'"[18] Further, because CMAs had been executed in Texas and provided that Texas law would govern disputes, the court stated that Coke could not "avoid the protections to Texas consumers provided by that same law."[19] The court did not explain how Texas consumers were protected by relief granted the RCC franchisees for Coke's conduct in other states. Alternatively, the court determined that the judgment could be based on the RCC franchisees' alleged violations of Arkansas, Louisiana, and Oklahoma antitrust statutes, and absent any contention that those statutes differed from Texas law, "we presume that the laws of those states are the same as ours."[20]

With respect to liability, the court rejected Coke's argument that the absence of any evidence showing a foreclosure of competition in any relevant market was fatal to each violation claimed by the RCC franchisees. The court did not take issue with Coke's assertion that such evidence was lacking but reasoned instead that liability could be based on evidence that enforcement of any of several CMA provi-sions—"ranging from limitations on shelf space and placement, to advertising requirements and limitations on both external and in-store advertising of competitors' products, to exclusive-flavor provisions, to pricing requirements that ensured Coke products would have a price advantage over other soft drinks"—"could be read to restrict trade and impact competition".[21] The court concluded simply that "[a]lthough any one of the[se] factors ... might be insufficient to allow the jury to conclude Coke had acted to restrain trade, due to the numerous factors presented in evidence, it is not appropriate to take this determination out of the hands of the jury."[22] As for the RCC franchisees' monopolization claims, the court rejected Coke's argument that there was insufficient evidence to define the relevant geographic market, and held that there was sufficient evidence for the jury to find monopolization, citing testimony that a bottler with 80 percent market share "could impose its market terms on retailers, that at least one retailer felt compelled to accept CMA terms ... [and] that Coke targeted one Bottler with the intention of taking it out of competition".[23]

We granted the petition for review.[24] In this Court, as in the court of appeals, Coke raises a number of issues. We find it necessary to address only two.

## II

Coke argues that the district court could not entertain an action for damages and injunctive relief based on injury that occurred in other states, either as a violation

---

16. *Post* at 691.

17. 111 S.W.3d 287 (Tex.App.-Texarkana 2003).

18. *Id.* at 296.

19. *Id.*

20. *Id.*

21. *Id.* at 304.

22. *Id.* at 305.

23. *Id.* at 306.

24. 47 Tex. Sup.Ct. J. 1028 (Sept. 3, 2004).

of the TFEAA or as a violation of the other states' laws. In effect, the argument challenges the district court's jurisdiction over the RCC franchisees' claims of injury outside Texas. Coke does not argue, and therefore we do not consider, whether such an action would interfere with interstate commerce in a way prohibited by the United States Constitution.[25] We consider only the reach of the TFEAA and whether a Texas court will enforce the antitrust laws of other states.

The RCC franchisees answer that the injuries they incurred outside Texas were actionable under the TFEAA because those injuries resulted from Coke's conduct within Texas, specifically, its business and policy decisions made at its offices in Texas and contract negotiations often handled in Texas, and because use of CMAs throughout a regional market that extended into Texas harmed consumers in Texas by affecting their ability to obtain the benefits of competition. In any event, the RCC franchisees contend, they were entitled to sue in Texas for violations of the antitrust laws of Arkansas, Louisiana, and Oklahoma. We take up each of the RCC franchisees' arguments in turn.

## A

■ A principle of federalism is that "[n]o State can legislate except with reference to its own jurisdiction."[26] In a 1914 case in which the Missouri Supreme Court held void a contract that was invalid under its state's law but valid under the law of New York, where it was made, the United States Supreme Court reversed, explaining:

it would be impossible to permit the statutes of Missouri to operate beyond the jurisdiction of that State and in the State of New York and there destroy freedom of contract without throwing down the constitutional barriers by which all the States are restricted within the orbits of their lawful authority and upon the preservation of which the Government under the Constitution depends. This is so obviously the necessary result of the Constitution that it has rarely been called in question and hence authorities directly dealing with it do not abound.[27]

But obvious and necessary though the principle may be, it is an abstraction without easy application in a freely mobile society. A dispute may have contacts with multiple states whose laws differ, and the choice of which state's law will govern necessarily gives that law some extraterritorial effect.[28]

It is an especially sensitive matter for a jurisdiction to extend its laws governing

---

**25.** Brief for Petitioners at 30 (stating that "the defendants have never contended that the TFEAA is inapplicable merely because the challenged conduct in this case affects or involves interstate commerce").

**26.** *Bonaparte v. Tax Court,* 104 U.S. 592, 594, 14 Otto 592, 26 L.Ed. 845 (1881) (quoted in *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 571, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)).

**27.** *New York Life Ins. Co. v. Head,* 234 U.S. 149, 161, 34 S.Ct. 879, 58 L.Ed. 1259 (1914) (quoted in *BMW of N. Am., Inc.,* 517 U.S. at 571 n. 16, 116 S.Ct. 1589).

**28.** *See, e.g., Minnesota Mining and Mfg. Co. v. Nishika Ltd.,* 955 S.W.2d 853, 856–858 (Tex. 1996) (per curiam) (stating that "[t]he present case involves contacts in at least seven jurisdictions: Minnesota, Nevada, Oklahoma, Georgia, Pennsylvania, Texas, and Italy", holding that the Minnesota version of section 2–318 of the Uniform Commercial Code applied, and certifying questions concerning that law to the Supreme Court of Minnesota); *Minnesota Mining and Mfg. Co. v. Nishika Ltd.,* 953 S.W.2d 733, 735–737 (Tex.1997) (after receipt of the answers to the certified questions, explaining further the basis for applying Minnesota law).

economic competition beyond its borders. Such laws necessarily reflect fundamental policy choices that the people of one jurisdiction should not impose on the people of another. In the international context, the United States Supreme Court recently refused to allow an action under the Sherman Antitrust Act for price-fixing outside the United States, even if that price-fixing had domestic effect required for a statutory exception, when its adverse foreign effect was independent of its adverse domestic effect, and that independent foreign effect was the sole cause of the injury at issue.[29] The Supreme Court reasoned:

No one denies that America's antitrust laws, when applied to foreign conduct, can interfere with a foreign nation's ability independently to regulate its own commercial affairs. But our courts have long held that application of our antitrust laws to foreign anticompetitive conduct is nonetheless reasonable, and hence consistent with principles of prescriptive comity, insofar as they reflect a legislative effort to redress *domestic* antitrust injury that foreign anticompetitive conduct has caused.

But why is it reasonable to apply those laws to foreign conduct *insofar as that conduct causes independent foreign harm and that foreign harm alone gives rise to the plaintiff's claim?* ... Why should American law supplant, for example, Canada's or Great Britain's or Japan's own determination about how best to protect Canadian or British or Japanese customers from anticompetitive conduct engaged in significant part by Canadian or British or Japanese or other foreign companies? ... We can find no good answer to the question.[30]

Similarly, within our federal system one may ask: why should Texas law supplant Arkansas, Louisiana, or Oklahoma law about how best to protect consumers from anti-competitive conduct and injury in those states? Or to put the shoe on the other foot, why should another state's law supplant Texas law about how best to protect consumers from anti-competitive conduct in Texas? There is no good answer.

■ This is particularly true when the conduct complained of is not a type widely regarded as *per se* anti-competitive, as for example horizontal price-fixing is,[31] but is instead thought to impair competition in some instances and enhance it in others, like the vertical marketing restraints in this case.[32] The principle of federalism

---

**29.** *F. Hoffmann–La Roche Ltd. v. Empagran, S.A.*, 542 U.S. 155, 165–174, 124 S.Ct. 2359, 159 L.Ed.2d 226 (2004) (construing the Foreign Trade Antitrust Improvements Act).

**30.** 542 U.S. at 165–166, 124 S.Ct. 2359 (citations omitted).

**31.** *See, e.g., Texaco, Inc. v. Dagher*, 547 U.S. 1, ——, 126 S.Ct. 1276, 1279–1280, 164 L.Ed.2d 1 (2006) (stating that *"[p]er se* liability is reserved for only those agreements that are 'so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality' ", citing *National Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978), and noting the *per se* rule against price-fixing, citing *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643,

647, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980) (per curiam)).

**32.** *Cf. Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 724, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988) ("In *Continental T. V., Inc. v. GTE Sylvania Inc.*, [433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977)], we refused to extend *per se* illegality to vertical nonprice restraints.... We noted that especially in the vertical restraint context 'departure from the rule-of-reason standard must be based on demonstrable economic effect rather than ... upon formalistic line drawing.' We concluded that vertical nonprice restraints had not been shown to have such a ' "pernicious effect on competition" ' and to be so ' "*lack* [ing][in] ... redeeming value" ' as to justify *per se* illegality. Rather, we found,

that requires states to respect each others' divergent laws on the former type of conduct, even when there is stronger consensus about its effects, is especially compelling when only the latter type of conduct is involved and there is wide room to disagree. One state's legislature cannot dictate to other states what can and cannot be tolerated in economic competition. This is "so obviously the necessary result" that it needs no supporting authority.

∎ We need not decide exactly how this principle limits the extraterritorial effect the Texas Legislature *could* give its antitrust laws. We conclude, as a matter of statutory construction, that the Legislature did not intend for the Act to be enforced as it has been here—that is, by awarding damages and injunctive relief for injury that occurred in other states. We start with the principle that a statute will not be given extraterritorial effect by implication but only when such intent is clear.[33]

The RCC franchisees argue, and the court of appeals held, that two provisions of the TFEAA clearly show that it can be enforced outside Texas.

One, section 15.25(b), states:

No suit under this Act shall be barred on the grounds that the activity or conduct complained of in any way affects or involves interstate or foreign commerce.

It is the intent of the legislature to exercise its powers to the full extent consistent with the constitutions of the State of Texas and the United States.[34]

The RCC franchisees argue from this provision that since a plaintiff is not *precluded* from suing under the Act merely because interstate commerce is affected or involved, a plaintiff is therefore *entitled to sue* merely because interstate commerce is affected or involved. The argument is obviously lacking in logic. Section 15.25(b) removes a defense to suit (to the extent it can constitutionally do so); it does not create a basis for suit. The mere involvement of interstate commerce does not permit a defendant to escape suit, but neither does it permit a plaintiff to sue. Coke contends that the Act does not afford an action for redress of injury that occurs outside Texas, whether interstate commerce is affected or not. Section 15.25(b) simply does not speak to that contention.

The other provision on which the RCC franchisees rely is section 15.04, which states:

The purpose of this Act is to maintain and promote economic competition in trade and commerce occurring wholly or partly within the State of Texas and to provide the benefits of that competition to consumers in the state. The provisions of this Act shall be construed to

---

they had real potential to stimulate interbrand competition, 'the primary concern of antitrust law,' . . . .") (citations omitted).

33. *Marmon v. Mustang Aviation, Inc.*, 430 S.W.2d 182, 187 (Tex.1968) (" 'Unless the intention to have a statute operate beyond the limits of the state or country is clearly expressed or indicated by its language, purpose, subject matter, or history, no legislation is presumed to be intended to operate outside the territorial jurisdiction of the state or country enacting it. To the contrary, the presumption is that the statute is intended to have no extraterritorial effect, but to apply only within

the territorial jurisdiction of the state or country enacting it, and it is generally so construed. An extraterritorial effect is not to be given statutes by implication.' "); *see also Equal Employment Opportunity Comm'n v. Arabian Am. Oil Co.*, 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) ("It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." (internal quotation marks omitted)).

34. TEX. BUS. & COM.CODE § 15.25(b).

accomplish this purpose and shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes to the extent consistent with this purpose.[35]

In the RCC franchisees' view, as long as relief provided by the Act will promote competition in Texas commerce, the same relief can extend to conduct in Arkansas, Louisiana, Oklahoma, or anywhere else in the world to promote competition there. That construction of the provision is simply unreasonable. What the Act says, rather plainly we think, is that it is to be used to promote competition in Texas, even if the trade or commerce involved extends outside Texas; it does not say that it is to be used to promote competition outside Texas as long as the trade or commerce involved extends into Texas. This is consistent with section 15.25(b), which indicates that the Act's purpose of redressing injury in Texas is not to be defeated merely because the injurious conduct also occurred in other states. The provision does not extend the Act's purpose to promoting competition outside Texas, as by remedying extraterritorial injury, which would provide no benefit to consumers "in the state." The RCC franchisees do not argue that compensating them for injury suffered in Arkansas, Louisiana, and Oklahoma will promote competition in Texas or benefit Texas consumers, and we do not see how they could on the record in this case. Rather, the RCC franchisees argue only that because Coke engaged in the same conduct in Texas and the other states and caused the same type of injury throughout the region, the Act

affords relief for injury outside Texas. It does not.

The fact that Coke made decisions in Texas regarding the CMAs used in other states, negotiated some of those CMAs in Texas, and used the same CMAs in Texas does not bring redress of the resulting injury in the other states within the TFEAA's purpose. Competition in Texas markets is not maintained or promoted, nor are Texas consumers benefited, by enjoining Coke from engaging in such conduct with respect to markets outside Texas or by awarding the RCC franchisees damages incurred in their operations outside Texas.

The TFEAA does not, in clear language, afford a cause of action for injury outside the state, and we will not imply one. This construction is consistent with the requirement of section 15.04 that the Act be "construed in harmony with federal judicial interpretations of comparable federal antitrust statutes to the extent consistent with [its] purpose." The Sherman Antitrust Act is a comparable federal antitrust statute,[36] and the United States Supreme Court has construed it to "reach conduct outside our borders ... only when the conduct has an effect on American commerce."[37]

■ The court of appeals further justified extraterritorial enforcement of the TFEAA in this case because Coke provided in CMAs that Texas law would govern disputes. Even if we assume that parties could agree to an extraterritorial enforcement of the TFEAA, and it is not at all

---

35. *Id.* § 15.04.

36. *Caller–Times Publ'g. Co. v. Triad Commc'ns, Inc.,* 826 S.W.2d 576, 580 (Tex. 1992) ("The current Texas Antitrust Act is modeled on both the Sherman Antitrust Act and the Clayton Act.").

37. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 582 n. 6, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 704, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962)).

clear to us that they could, the disputes in this case are not among the contracting parties—Coke and CSD retailers—but among Coke and the RCC franchisees, competing bottlers who had no agreement about what law would govern their disputes.

**B**

■ Having concluded that the RCC franchisees' complaints of extraterritorial injury were not actionable under the TFEAA, we turn to their argument that such injury was actionable under the laws of the states in which injury occurred. Long ago we observed that in "[c]ases in which a right given by the statute of one state is sought to be enforced in the court of another, in which laws exist giving a like right under the same facts ..., it seems to be generally held that courts of the latter state will recognize and enforce the right given by the statutes of another state." [38] Or as the United States Supreme Court has stated, "where the statute of the state in which the cause of action arose is not in substance inconsistent with the statutes or public policy of the state in which the right of action is sought to be enforced", the forum court will allow the action. [39] The rule is largely one not of constitutional necessity but of interstate comity, "a prin-

ciple of mutual convenience whereby one state or jurisdiction will give effect to the laws and judicial decisions of another." [40] The United States Supreme Court has explained that

> the full faith and credit clause [41] does not require the enforcement of every right conferred by a statute of another State. There is room for some play of conflicting policies.... A State may, on occasion, decline to enforce a foreign cause of action. In so doing, it merely denies a remedy, leaving unimpaired the plaintiff's substantive right, so that he is free to enforce it elsewhere.[42]

The forum court may decline to entertain an action based on another state's statute if "the enforcement of the right conferred would be obnoxious to the public policy of the forum, ... or ... the liability imposed is deemed a penal one." [43]

■ The RCC franchisees have not attempted to show that the antitrust statutes of Arkansas, Louisiana, and Oklahoma "give[ ] a like right under the same facts" as Texas law or are "not in substance inconsistent" with the TFEAA or public policy in this state. They simply contend that these other states' laws must be presumed to be identical to Texas law because Coke has made no assertion to the con-

---

38. *Texas & Pac. Ry. Co. v. Richards*, 68 Tex. 375, 4 S.W. 627, 628 (1887).

39. *Texas & Pac. Ry. Co. v. Cox*, 145 U.S. 593, 605, 12 S.Ct. 905, 36 L.Ed. 829 (1892).

40. *Gannon v. Payne*, 706 S.W.2d 304, 306 (1986) (internal quotation marks omitted).

41. U.S. Const. art. IV, § 1 ("Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.").

42. *Bradford Elec. Light Co. v. Clapper*, 286 U.S. 145, 160, 52 S.Ct. 571, 76 L.Ed. 1026

(1932) *holding disapproved on other grounds in Crider v. Zurich Ins. Co.*, 380 U.S. 39, 43, 85 S.Ct. 769, 13 L.Ed.2d 641 (1965) (noting that subsequent cases disregarded *Clapper's* rationale for applying the exclusivity provision of the non-forum state's workers compensation statute).

43. *Id.* (citations omitted); *see also* Restatement (Second) of Conflict of Laws § 89 (1971) ("No action will be entertained on a foreign penal cause of action."); *id.* § 90 ("No action will be entertained on a foreign cause of action the enforcement of which is contrary to the strong public policy of the forum.").

trary. It is true that Texas courts *can* presume that the determinative law of another state is the same as Texas law absent proof or argument to the contrary,[44] but no such presumption can be applied here, in light of the policy directive incorporated in the TFEAA. As noted above, section 15.04 states that the Act "shall be construed to accomplish [its] purpose", which is "to maintain and promote economic competition in trade and commerce occurring wholly or partly *within the State of Texas* and to provide the benefits of that competition to consumers *in the state*." [45] We will not presume that Arkansas, Louisiana, and Oklahoma antitrust law is *identical* to the TFEAA, because we would then be required to construe that law to redress the RCC franchisees' injury from Coke's conduct in those states to maintain and promote competition in Texas and provide the benefits to Texas consumers. Since, as we have seen, the injury in those states was independent of injury in Texas, this would obviously be nonsensical, not to mention a significant imposition on our sister states. Nor can we take a less strict approach and replace "Texas" in section 15.04's statement of purpose with the names of each other state, because that would require us apply the law to the RCC franchisees' claims of injury in the other states so as to maintain and promote competition in each of those states and provide its benefits to their consumers, respectively. For a court in one state to undertake to determine what would benefit competition and consumers in another state would pose a significant affront to the interstate comity sister states should accord each other in our federal system.

■ This difficulty cannot be avoided by ignoring section 15.04 altogether. It states what is otherwise apparent, that enforcement of antitrust laws like the TFEAA must serve economic policy that has broad public impact, about which there can be considerable disagreement among jurisdictions in a rule-of-reason case like this one. When antitrust law was much younger, Justice Cardozo observed:

> There are some rules of private law which have been shaped in their creation by public policy, and this, not merely silently or in conjunction with other forces, but avowedly, and almost, if not quite, exclusively. These, public policy, as determined by new conditions, is competent to change. I take as an illustration modern decisions which have liberalized the common law rule condemning contracts in restraint of trade.... The field is one where the law is yet in the making or better perhaps in the remaking. We cannot doubt that its new form will bear an impress of social needs and values which are emerging even now to recognition and to power.[46]

The United States Supreme Court has more recently observed that "varying times and circumstances" give antitrust law "changing content".[47] We do not think that the courts of one state should determine for another state the economic theory and social needs and values that provide content to its antitrust laws.

**44.** *Gevinson v. Manhattan Constr. Co. of Okla.*, 449 S.W.2d 458, 465 n. 2 (Tex.1969); *Milner v. Schaefer*, 211 S.W.2d 600, 603 (Tex. Civ.App.-San Antonio 1948, writ ref'd); *Tempel v. Dodge*, 89 Tex. 69, 33 S.W. 222, 222 (1895).

**45.** TEX. BUS. & COM.CODE § 15.04 (emphasis added).

**46.** B. CARDOZO, THE NATURE OF THE JUDICIAL PROCESS 94–97 (1921) (discussing the influence of public policy concerns regarding restraints of trade and labor unions).

**47.** *Business Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 731, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988).

The RCC franchisees' claims under Arkansas, Louisiana, and Oklahoma law affect not only the parties to the case who operate there but consumers in parts of each of those states. The general rule that a state will enforce a right created by another state's statute is intended to foster interstate comity.[48] The rule may be reflected in the forum's own statutes, as it is in the Texas Wrongful Death Act, for example, which allows a cause of action for nonresidents and for death outside the state and provides that "[t]he court shall apply the rules of substantive law that are appropriate under the facts of the case",[49] including another state's statutes. The rule helps assure stability and predictability in commercial transactions when the forum court is called upon to apply another state's version of the Uniform Commercial Code.[50] In such instances, interstate comity is respected by a forum court's enforcement of another state's statutes. But when the forum court must determine policies that broadly impact the public of another state in order to adjudicate rights claimed under that state's statutes, interstate comity is protected by abstention, not enforcement.

Although cases abound in which courts allow actions under other states' statutes, the parties have not cited one in which a court either allowed or disallowed an action under another state's antitrust statutes, even though many states, like Texas, enacted antitrust laws more than a century ago. The issue is not likely to have arisen, we think, because a court's refusal to entertain an action based on another state's antitrust law does not deprive the plaintiff of a forum. One would ordinarily suppose that the plaintiff would sue in the courts of the state where the injury occurred, which will have jurisdiction over the defendant by virtue of its conduct in the state. There is no reason to believe the Arkansas, Louisiana, and Oklahoma courts would not have jurisdiction over the conduct in issue here. Alternatively, the plaintiff could sue in federal court for violation of federal antitrust laws, on which most state laws are based, and try to pursue pendent state law claims.[51] In these circumstances, it is not necessary for interstate accommodation that a state's antitrust laws be enforced in the courts of another state.

The dissent argues that the trial court's application of other states' antitrust laws is merely a matter of choice of law with no jurisdictional implications. But the issue is not whether antitrust claims involving actors, conduct, and public injury all in another state should be governed by that state's law or Texas law. That decision would be relatively simple: the other state's law should govern. Rather, the issue is whether a Texas court can or should enforce law that is so policy-

---

**48.** *K.D.F. v. Rex,* 878 S.W.2d 589, 593–594 (Tex.1994).

**49.** TEX. CIV. PRAC. & REM.CODE § 71.031.

**50.** *See, e.g., Minnesota Mining and Mfg. Co. v. Nishika Ltd.,* 953 S.W.2d 733, 737–738 (Tex. 1997) (applying Minnesota's version of a provision of the Uniform Commercial Code).

**51.** *See Marrese v. American Acad. of Orthopaedic Surgeons,* 726 F.2d 1150, 1166 (7th Cir.1984) (Flaum, J., concurring in part and dissenting in part) (suggesting that plaintiffs should have brought their state claims and federal antitrust claims contemporaneously, either by bringing concurrent state and federal actions or by "bring[ing] their entire cause of action in federal court and attempt[ing] to have their state claims adjudicated under that court's pendent jurisdiction"), *cited by* 470 U.S. 373, 385–386, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985) (*overruling court of appeals' plurality opinion holding that petitioners' federal antitrust claims were barred by prior Illinois state court action raising only state claims*).

laden so as to affect the economy of another state. Choice-of-law principles do not address that issue.

■ The dissent also suggests that whether a state court should adjudicate a case based on another state's antitrust law is better determined by principles of *forum non conveniens*, "a venue matter that is waived if never requested."[52] We are not persuaded that *forum non conveniens* is merely a "venue matter." A Texas statute governing wrongful death, survival, and personal injury actions requires courts, on a proper written motion, to "decline to exercise jurisdiction under the doc-

trine of forum non conveniens" when, *inter alia*, the claimant is not a legal resident of the state.[53] And, irrespective of whether this doctrine is jurisdictional, it is not an apt framework for analyzing the issue before us. While an important consideration for *forum non conveniens* is the public interest in having a matter decided where it arises, a concern with jurisdictional overtones, the doctrine tends to focus on the practicalities of litigating in one place or another, such as the availability of evidence, the convenience of the parties, and the imposition on the chosen forum's resources.[54] Here, the parties do not argue

---

**52.** *Post* at 698.

**53.** TEX. CIV. PRAC. & REM.CODE § 71.051(b) ("If a court of this state, on written motion of a party, finds that in the interest of justice and for the convenience of the parties a claim or action to which this section applies [that is, for wrongful death, survival, or personal injuries] would be more properly heard in a forum outside this state, the court shall decline to exercise jurisdiction under the doctrine of forum non conveniens and shall stay or dismiss the claim or action. In determining whether to grant a motion to stay or dismiss an action under the doctrine of forum non conveniens, the court shall consider whether: (1) an alternate forum exists in which the claim or action may be tried; (2) the alternate forum provides an adequate remedy; (3) maintenance of the claim or action in the courts of this state would work a substantial injustice to the moving party; (4) the alternate forum, as a result of the submission of the parties or otherwise, can exercise jurisdiction over all the defendants properly joined to the plaintiff's claim; (5) the balance of the private interests of the parties and the public interest of the state predominate in favor of the claim or action being brought in an alternate forum, which shall include consideration of the extent to which an injury or death resulted from acts or omissions that occurred in this state; and (6) the stay or dismissal would not result in unreasonable duplication or proliferation of litigation.").

**54.** "Wisely, it has not been attempted to catalogue the circumstances which will justify or

require either grant or denial of [dismissal based on *forum non conveniens*]. The doctrine leaves much to the discretion of the court to which plaintiff resorts, and experience has not shown a judicial tendency to renounce one's own jurisdiction so strong as to result in many abuses.

"If the combination and weight of factors requisite to given results are difficult to forecast or state, those to be considered are not difficult to name. An interest to be considered, and the one likely to be most pressed, is the private interest of the litigant. Important considerations are the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforcibility of a judgment if one is obtained. The court will weigh relative advantages and obstacles to fair trial. It is often said that the plaintiff may not, by choice of an inconvenient forum, 'vex,' 'harass,' or 'oppress' the defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy. But unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.

"Factors of public interest also have place in applying the doctrine. Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being

that it would have been more convenient to try this case in one of the other states a few miles away. The issue is not whether it is convenient for a Texas court to apply another state's antitrust law to an extra-territorial injury, but whether it is proper, as a matter of comity, for a Texas court to do so.

■ The dissent stresses that not only are the antitrust laws of Arkansas, Louisiana, and Oklahoma presumptively the same as Texas law for purposes of this case, these states' statutes are virtually identical to Texas' statute, which is not surprising, given that they are all modeled on federal law. But it is precisely this characteristic that raises the issue of their applicability in a Texas court: like federal law, economic theory and social needs and values give them "changing content". Because of the importance of policy in determining and enforcing antitrust laws, we think a state's antitrust laws should be applied by its own courts. The dissent worries that this makes antitrust enforcement inefficient, especially in a case like this where market conduct is alleged to have straddled state lines. But if the RCC franchisees had wanted efficiency, they could have sued in federal court under federal antitrust laws.

Accordingly, we conclude that the district court should not have entertained the RCC franchisees' claims under Arkansas, Louisiana, and Oklahoma law.

## III

■ We are left with the RCC franchisees' claims of injury in Texas from Coke's use of CMAs in violation of the TFEAA. Coke argues that the claimed violations require proof of market-wide harm[55]—a substantial foreclosure of competition or a pervasive, adverse impact on price, output, or choice[56]—but that there is only evidence of harm in relatively isolated instances and no evidence of substantial foreclosure or anti-competitive effect in any relevant market. Coke concedes that CCE had a 75–80 percent share of the CSD markets in the Ark–La–Tex region, but it contends that competition in the CSD markets in that region was always vigorous and that the RCC franchisees' individual businesses suffered from too much competition, not too little. The RCC franchisees agree that evidence of market harm is required to prove an unreasonable restraint of trade, and to a lesser extent, they say, monopolization, but they argue that such evidence is not necessary to prove an attempt or conspiracy to monopolize. In any event, the RCC franchisees contend, the record contains evidence of market harm sufficient for liability.

In analyzing these contentions, we must, as we have noted, construe the TFEAA in harmony with federal antitrust caselaw to promote competition for consumers' bene-

---

handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation. In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a

court in some other forum untangle problems in conflict of laws, and in law foreign to itself."
*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–509, 67 S.Ct. 839, 91 L.Ed. 1055 (1947) (footnotes omitted), *quoted in Flaiz v. Moore*, 359 S.W.2d 872, 874 (Tex.1962).

**55.** *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 31–32, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984).

**56.** *See Id.*

fit.[57]   Because our own caselaw is limited, we rely heavily on the jurisprudence of the federal courts.  The RCC franchisees never argue that the vertical marketing restrictions imposed by the CMAs are unlawful *per se*, leaving us with the so-called rule of reason to determine whether those restrictions amount to an unreasonable restraint on competition.  As the United States Supreme Court has stated:

> Although vertical agreements on resale prices have been illegal *per se* since *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911), we have recognized that the scope of *per se* illegality should be narrow in the context of vertical restraints.  In *Continental T. V., Inc. v. GTE Sylvania Inc.*, [433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977)], we refused to extend *per se* illegality to vertical nonprice restraints. . . . We noted that especially in the vertical restraint context "departure from the rule-of-reason standard must be based on demonstrable economic effect rather than . . . upon formalistic line drawing." We concluded that vertical nonprice restraints had not been shown to have such a " 'pernicious effect on competition' " and to be so " 'lacking [in] . . . redeeming value' " as to justify *per se* illegality.  Rather, we found, they had real potential to stimulate interbrand competition, "the primary concern of antitrust law." [58]

The extensive record in this case is replete with evidence that Coke used its dominant market position to extract from retailers agreements with terms it might not otherwise have been able to obtain to promote its products with more favorable advertising and store displays and lower prices.    Unquestionably, Coke's CMAs *could have had* anticompetitive and monopolistic effects.   The court of appeals concluded that the jury was therefore entitled to infer that the CMAs *did have* such effects.[59]   But to allow such an inference violates the rule of reason analysis that must be applied to such conduct.   There must be evidence of "demonstrable economic effect",[60] not just an inference of *possible* effect.

There is no evidence quantifying the effect of Coke's CMAs in any relevant market—no evidence, for example, that the CMAs had the effect of foreclosing a specific *percentage* of competition in any relevant market.   But the RCC franchisees contend that no such evidence was required.   They argue that to the extent they were required to show market foreclosure, evidence that it was substantial was sufficient.[61]   But even if market foreclosure need not have been quantified by a specific percentage, there is no evidence that it was substantial.   The evidence is only that the CMAs promoted Coke's products over its competitors' and made it more difficult for them to compete.   Further, while there is evidence that sometimes retailers priced some packages of CSDs higher than they would have so that they could meet their agreements to price Coca–Cola and Dr Pepper lower, consumers could have avoided the effect by "going down the street" to another store.   There

---

**57.**   Tex. Bus. & Com.Code § 15.04.

**58.**   *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 724, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988) (citations omitted).

**59.**   111 S.W.3d 287, 304–305 (Tex.App.-Texarkana 2003).

**60.**   *Business Elecs. Corp.*, 485 U.S. at 724, 108 S.Ct. 1515.

**61.**   *Cf. Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328–329, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961).

is no evidence that such isolated instances impacted consumers throughout any exclusive territory, much less throughout the Ark–La–Tex region. While consumers may have paid more on occasion in a particular store, there is no evidence that Coke's CMAs caused consumers to pay higher prices generally.

The RCC franchisees argue that even if they failed to show market harm, that failure was not fatal to their claims of monopolization, attempted monopolization, and conspiracy to monopolize. Since Coke does not dispute that it has a 75–80 percent market share in the Ark–La–Tex region, which is sufficient evidence to support a jury finding of monopoly power,[62] to prove monopolization the RCC franchisees were required to show only "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident."[63] But this requires evidence of some harm to competition in the market, which is missing in this case. For the same reason, the RCC franchisees' claim of conspiracy to monopolize must fail.[64] And to prove attempted monopoli-

zation, the RCC franchisees were required to show "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."[65] Again, since there is evidence only that Coke's CMAs *could* have had an adverse effect on competition in a relevant market, not that they actually did, existence of the CMAs *alone* cannot prove Coke engaged in predatory or anticompetitive conduct.

Because the RCC franchisees failed to prove an antitrust violation, their claim for tortious interference with a business relationship must also fail. Such a claim cannot survive without an antitrust violation because tortious interference with a business relationship requires proof of "independently tortious or unlawful" conduct,[66] and RCC franchisees expressly state here that they did not plead tortious interference with contract.

We agree with the RCC franchisees that Coke's use of CMAs store by store and area by area cannot be viewed in isolation but must be seen as a whole in assessing their impact on the market.[67] By the same

---

62. *See, e.g., Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (holding evidence that defendant controlled almost 100 percent of the parts market and 80–95 percent of the service market created a fact issue for the jury on the question of monopoly power); *United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966) (holding that defendants' control of 87 percent of the relevant market "leaves no doubt" defendants had monopoly power).

63. *Caller–Times Publ'g Co. v. Triad Commc'ns, Inc.*, 826 S.W.2d 576, 580 (Tex.1992) (quoting *Grinnell Corp.*, 384 U.S. at 570–571, 86 S.Ct. 1698).

64. *See, e.g., NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 139, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998).

65. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993).

66. *Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 713 (Tex.2001).

67. *See, e.g., Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962) ("[In antitrust cases] plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."); *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir.2003) ("The relevant inquiry is the anticompetitive effect of [the defendant's] exclusionary practices considered together.... [C]ourts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation.").

token, the effects cannot be viewed in isolation but must be assessed with respect to the relevant markets.[68] There is no evidence any relevant market claimed by the RCC franchisees was harmed by Coke's CMAs.

Remarkably, the dissent would hold Coke liable for *per se* violations of the antitrust laws—price fixing, group boycott, and advertising limitations—even though the RCC franchisees do not themselves allege that any of Coke's conduct was a *per se* violation. No court in the cases that have been brought to our attention has concluded that vertical marketing agreements like Coke's CMAs, by themselves, violate antitrust laws under a rule-of-reason analysis.[69] And no court of which we are aware has held that a defendant is liable for a *per se* violation of the antitrust laws that the plaintiff never alleged. Doubly unprecedented, the dissent requires no further answer.

\* \* \* \* \* \*

Accordingly, the court of appeals' judgment is reversed. The RCC franchisees' claims of injury occurring in other states are dismissed. On their claims of injury occurring in Texas, judgment is rendered that the RCC franchisees take nothing.

**68.** *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex.1990).

**69.** *See, e.g., El Aguila Food Prods. Inc. v. Gruma Corp.*, 131 Fed. Appx. 450 (5th Cir. 2005), *aff'g* 301 F.Supp.2d 612, 628–632 (S.D.Tex.2003); *R.J. Reynolds Tobacco Co. v. Philip Morris USA*, 67 Fed. Appx. 810, 811–812 (4th Cir.2003), *aff'g* 199 F.Supp.2d 362 (M.D.N.C.2002); *Bayou Bottling Inc. v. Dr. Pepper Co.*, 725 F.2d 300, 304 (5th Cir.1984); *Louisa Coca–Cola Bottling Co. v. Pepsi–Cola Metro. Bottling Co.*, 94 F.Supp.2d 804 (E.D.Ky.1999); *Frito–Lay, Inc. v. Bachman Co.*, 659 F.Supp. 1129, 1134 (S.D.N.Y.1986); *Beverage Mgmt., Inc. v. Coca–Cola Bottling Corp.*, 653 F.Supp. 1144 (S.D.Ohio 1986). *But cf. Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir.2002) (jury finding

Justice BRISTER filed a dissenting opinion in which Chief Justice JEFFERSON, Justice O'NEILL, and Justice MEDINA joined.

## APPENDIX

### Text of Permanent Injunction Issued by the District Court

"It is further ORDERED that Plaintiffs do have and recover the following injunctive relief.... [T]he following definitions shall and do hereby apply:

"A. 'CCE' means Coca–Cola Enterprises Inc., Coca–Cola Bottling Company of North Texas, Paris Coca–Cola Bottling, the Coca–Cola Bottling Company of Texarkana, Coca–Cola Bottling Company of Shreveport, Sulphur Springs Coca–Cola Bottling Company and Ouachita Coca–Cola Bottling Company, their officers, employees, agents, servants, attorneys and those persons in active concert or participation with them who receive actual notice of this Judgment by personal service or otherwise.

"B. 'COCA–COLA' means The Coca–Cola Company, its officers, employees, agents, servants, attorneys and those persons in active concert or participation with

of a violation of section 2 of the Sherman Act was supported by evidence showing that USTC systematically tried to exclude competition from the moist snuff market by: (1) removing, destroying or discarding racks that displayed other moist snuff products while hiding plaintiff's products in USTC racks; (2) training USTC operatives to take advantage of store clerk inattention and various ruses to "reorganize" the moist snuff section; (3) misusing its position as category manager by providing misleading information to retailers in an effort to dupe them into carrying USTC products and to discontinue carrying plaintiff's products; and (4) entering into exclusive agreements with retailers in an effort to exclude rivals' products).

them who receive actual notice of this Judgment by personal service or otherwise.

"C. 'Relevant Geographic Territory' means:

1. In the state of Texas, the counties of Bowie, Camp, Cass, Delta, Fannin, Franklin, Hopkins, Lamar, Morris, Red River and Titus;

2. In the state of Oklahoma, the counties of Choctaw, Pushmataha, and McCurtain;

3. In the state of Arkansas, the counties of Ashley, Bradley, Calhoun, Chichot, Clark, Cleveland, Columbia, Dallas, Desha, Drew, Hempstead, Howard, Lafayette, Lincoln, Little River, Miller, Nevada, Ouschita, Pike, Sevier and Union; and

4. In the state of Louisiana, the parishes of Caddo, Bossier, Webster, Red River and De Soto.

"It is further ORDERED that CCE and Coca–Cola shall not, by contract, mutual understanding, calendar marketing agreement, promotional agreement, rebate program, price discount program or other program or agreement, directly or indirectly in any of the Relevant Geographic Territory:

"1. Prohibit any retail outlet from displaying, installing, or permitting the display, use or installation of any signage, banners, shelf talkers, static clings or other form of point of sale material for national brand carbonated soft drinks offered or distributed by a firm other than a firm licensed or franchised for the distribution of national brand carbonated soft drinks by, through or under the Coca–Cola Company;

"2. Require any retailer to prohibit, refuse or refrain from the advertising, in any manner, or promotion in any manner, at any time of any national brand carbonated soft drinks offered or distributed by any firm other than a firm licensed or franchised for the distribution or sale of national brand carbonated soft drinks, by, through, or under the Coca–Cola Company;

"3. Prohibit any retailer or retail outlet from allowing, using, placing or permitting the use or placement of any form or type of cold equipment for the sale, merchandising, display or promotion on national brand carbonated soft drinks offered or distributed by any firm other than a firm licensed or franchised for the distribution or sale of national brand carbonated soft drinks by, through or under the Coca–Cola Company;

"4. Prohibit any retailer or retail outlet from authorizing, displaying, advertising, promoting or selling any national brand carbonated soft drinks, including any and all colas and flavor varieties thereof, offered or distributed by any firm other than a firm licensed or franchised for the distribution or sale of national brand carbonated soft drinks, by, through or under the Coca–Cola Company;

"5. Requiring, suggesting or proposing that any retailer or retail outlet agree to or utilize any form of horizontal set for any cold vault space or cold equipment space for the merchandising, displaying, distribution or sale of national brand carbonated soft drinks within any such retailers location or retail outlet;

"6. Propose or require that any retailer or retail outlet utilize, agree to or accept any cold equipment ratios or vendor ratios or other ratios for any cold equipment that contain or offer for sale to consumers any national brand carbonated soft drinks;

"7. Offering, propose or require that any retailer or retail outlet agree to or utilize any term or condition prohibited by

paragraphs one (1) through six (6) above as a condition, requirement or understanding for the obtaining of any discount, rebate, calendar market agreement payment, promotional payment, bonus payment or any other form of monetary or price support or incentive in connection with the purchase, marketing, promotion or sale of national brand carbonated soft drinks distributed by or through CCE and/or Coca-Cola;

"8. Paragraphs 1 through 7 above:

(1) Apply to all retail outlets in the Relevant Geographic Territory;

(2) Do not apply to retailers who have no outlets in the Relevant Geographic Territory; and

(3) Apply only to those retail outlets in the Relevant Geographic Territory for a retailer who has retail outlets both inside and outside the Relevant Geographic Territory.

"It is further ORDERED that the requirements of paragraphs 1 through 8 shall be and remain in full force and effect for a period of seven (7) calendar years from June 4, 2001 or for a period of seven (7) calendar years from the date this Final Judgment becomes final, in the event that the requirements of this Final Judgment shall be suspended during any appeal or legal action.

"It is further ORDERED that this Court shall retain jurisdiction to enforce this Order. It is ORDERED that CCE and COCA–COLA shall be allowed, at the end of three and one-half (3–1/2) calendar years from June 4, 2001 or three and one-half (3 –1/2) calendar years from the date this Final Judgment becomes final in the event that the requirements of this Final Judgment shall be suspended during any appeal or legal action, to file appropriate motions with the Court seeking modification, alteration or termination of the injunctive provisions ... if other distributors of national brand carbonated soft drinks are engaging in activities which are covered by the [injunctive] provisions ... and the effect is believed to be injuring competition."

Justice BRISTER, joined by Chief Justice JEFFERSON, Justice O'NEILL, and Justice MEDINA, dissenting.

After buying up distributors of the leading soft drink brands in the Ark–La–Tex area, Coke began demanding that retailers stop advertising competing brands, stop selling some of them, and artificially raise the prices of the rest. Retailers who refused to play along were punished with higher wholesale prices; only Wal–Mart (a behemoth in its own right) successfully refused.

There is a line between competing and bullying, and the jury found that Coke crossed it. As evidence in the record would allow reasonable jurors to reach that conclusion, I would not render judgment to the contrary; because the Court does, I respectfully dissent.

## I. Choice of Law is not Jurisdictional

This suit concerns competition in 40 counties, 11 of which are in Texas. The Court vacates most of the jury's verdict because it concerns counties outside Texas, holding that Texas courts have no jurisdiction of such claims. This jurisdictional ruling is unprecedented.

I agree Texas law cannot extend beyond the limits of our sovereignty,[1] cannot punish foreign conduct that was legal where it

---

1. See *Hilton v. Guyot*, 159 U.S. 113, 163, 16 S.Ct. 139, 40 L.Ed. 95 (1895); *Gannon v.*

*Payne*, 706 S.W.2d 304, 306 (Tex.1986).

occurred,[2] cannot govern foreign conduct that has no effect here,[3] and cannot regulate prices in foreign stores merely because Texans might shop there.[4] But this verdict was not limited to Texas law.

The bottlers asserted Texas law applied, but pleaded alternatively that the laws of Arkansas, Louisiana, and Oklahoma outlawed the same conduct. They asserted that our neighbors' antitrust laws were the same as our own, and Coke never denied it. The jury simply found that Coke unreasonably restrained trade and monopolized the relevant markets. Unless our sister states define monopolies or restraints of trade differently than we do, it makes no difference whether the jury's findings were based on Texas law or some other.[5]

The trial court's punitive damages question did ask jurors if Coke wilfully and flagrantly violated Texas antitrust laws, and part of its prolix instructions defined "trade" and "commerce" as "economic activity undertaken in whole or in part for the purpose of financial gain involving or

relating to any goods or services within the State of Texas." But in conducting a proper choice-of-law analysis, "we must *first* decide whether Texas law conflicts with the laws of other interested states, as there can be no harm in applying Texas law if there is no conflict."[6] Unless there is some conflict between the antitrust laws of Arkansas, Louisiana, Oklahoma, and Texas, we cannot reverse the jury's verdict, as these two brief references to Texas made no difference.[7]

Instead of resolving this choice-of-law issue with choice-of-law rules, the Court treats it as a jurisdictional defect. Until today, no one has ever suggested the trial court had no subject-matter jurisdiction of this case. Certainly not Coke—its 75 pages of briefing never mention "subject matter" and never once challenge the trial court's jurisdiction. Coke instead argued below and argues here that Texas law does not *apply* to competition in markets outside Texas.[8] That is a choice-of-law issue, not one of subject-matter jurisdiction.

---

**2.** *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 421, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572–73, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

**3.** *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 822, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) (holding states "may not abrogate the rights of parties beyond its borders having no relation to anything done or to be done within them") (citation omitted).

**4.** *See Bigelow v. Virginia*, 421 U.S. 809, 824, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975) ("A State does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that State.").

**5.** *See Shutts*, 472 U.S. at 816, 105 S.Ct. 2965 ("There can be no injury in applying Kansas law if it is not in conflict with that of any other jurisdiction connected to this suit."); *In re AdvancePCS Health L.P.*, 172 S.W.3d 603,

606 (Tex.2005) (per curiam) (holding that in the absence of conflicting laws, "there can be no harm in applying Texas law"); *Compaq Computer Corp. v. Lapray*, 135 S.W.3d 657, 672 (Tex.2004) (same); *In re J.D. Edwards World Solutions Co.*, 87 S.W.3d 546, 550 (Tex. 2002) (per curiam) (same).

**6.** *Compaq*, 135 S.W.3d at 672 (emphasis added).

**7.** *See* Tex.R.App. P. 44.1.

**8.** In its brief, Coke stated that the issue presented was "does the TFEAA apply to agreements that are implemented outside the State of Texas and do not affect Texas consumers?" Similarly, the court of appeals said that "Coke contends the trial court erred in its extraterritorial application of the Texas Free Enterprise and Antitrust Act ... [to] retail establishments outside the State of Texas." 111 S.W.3d 287, 294 (Tex.App.-Texarkana 2003).

The distinction is important because choice-of-law issues (unlike jurisdictional issues) can be waived, as Coke has done here. Coke maintains that it objected to the application of Texas law, but concedes that it never requested the application of any other state's laws or offered proof of any of them. While the trial court could have judicially noticed those laws, it was not required to do so under Rule 202 of the Texas Rules of Evidence.[9] When a party fails to request judicial notice of the law of another state as permitted under Rule 202, "Texas courts will simply presume that the law of the other state is identical to Texas law."[10]

This presumption is much older than Rule 202 itself. We stated in 1895 that "[i]n the absence of proof the court will presume the law of another State to be the same as the law of this State . . ."[11] There could hardly be a clearer rule in the history of Texas jurisprudence; this Court has decided literally dozens of cases on precisely this presumption.[12] So has our sister court in criminal cases.[13] By failing to prove that Texas law conflicts with the laws of Arkansas, Louisiana, or Oklahoma,

9. Tex.R. Evid. 202 ("A court upon its own motion may, or upon the motion of a party shall, take judicial notice of the constitutions, public statutes, rules, regulations, ordinances, court decisions, and common law of every other state, territory, or jurisdiction of the United States.").

10. Olin Guy Wellborn III, *Judicial Notice Under Article II of the Texas Rules of Evidence*, 19 ST. MARY'S L.J. 1, 27 (1987).

11. *Tempel v. Dodge*, 89 Tex. 69, 33 S.W. 222, 222 (1895).

12. *See Gen. Chem. Corp. v. De La Lastra*, 852 S.W.2d 916, 920 (Tex.1993); *Gevinson v. Manhattan Constr. Co.*, 449 S.W.2d 458, 465 n. 2 (Tex.1969); *Ogletree v. Crates*, 363 S.W.2d 431, 435 (Tex.1963); *S. Pac. Co. v. Porter*, 160 Tex. 329, 331 S.W.2d 42, 45 (1960); *State v. Thomasson*, 154 Tex. 151, 275 S.W.2d 463, 464 (1955); *Massachusetts v. Davis*, 140 Tex. 398, 168 S.W.2d 216, 220 (1943); *Abeel v. Weil*, 115 Tex. 490, 283 S.W. 769, 776 (1926); *Ferguson–McKinney Dry Goods Co. v. Garrett*, 252 S.W. 738, 742 (Tex. Comm'n App.1923, holding approved); *Nevill v. Gulf, C. & S.F. Ry. Co.*, 244 S.W. 980, 984 (Tex. Comm'n App.1922, holding approved); *Am. Nat. Bank of Oklahoma v. Garland*, 235 S.W. 562, 564 (Tex. Comm'n App.1921, judgment adopted); *Lamb v. Hardy*, 109 Tex. 414, 211 S.W. 445, 446 (1919); *W. Union Tel. Co. v. Bailey*, 108 Tex. 427, 196 S.W. 516, 518 (1917); *Nat'l Bank of Commerce v. Kenney*, 98 Tex. 293, 83 S.W. 368, 369 (1904); *Rivera v. White*, 94 Tex. 538, 63 S.W. 125, 126 (1901); *Gill v. Everman*, 94 Tex. 209, 59 S.W. 531, 532 (1900); *Blethen v. Bonner*, 93 Tex. 141,

53 S.W. 1016, 1016 (1899); *Burgess v. W. Union Tel. Co.*, 92 Tex. 125, 46 S.W. 794, 795 (1898); *S. Ins. Co. of New Orleans v. Wolverton Hardware Co.*, 19 S.W. 615, 615 (Tex. 1892); *James v. James*, 81 Tex. 373, 16 S.W. 1087, 1089 (1891); *Abercrombie v. Stillman*, 77 Tex. 589, 14 S.W. 196, 197 (1890); *Houston & T.C. Ry. Co. v. Baker*, 57 Tex. 419, 422 (Tex.1882); *Porcheler v. Bronson*, 50 Tex. 555, 561 (Tex.1879); *Armendiaz v. De La Serna*, 40 Tex. 291, 297 (Tex.1874); *Green v. Rugely*, 23 Tex. 539, 544–45 (Tex.1859); *Moseby v. Burrow*, 52 Tex. 396, 405 (Tex.1880); *Bradshaw v. Mayfield*, 18 Tex. 21, 30 (Tex.1856).

13. *See, e.g., Crane v. State*, 786 S.W.2d 338, 347 (Tex.Crim.App.1990); *Langston v. State*, 776 S.W.2d 586, 587 (Tex.Crim.App.1989); *Smith v. State*, 683 S.W.2d 393, 406 (Tex. Crim.App.1984); *Acosta v. State*, 650 S.W.2d 827, 828 (Tex.Crim.App.1983); *Hall v. State*, 619 S.W.2d 156, 158 (Tex.Crim.App.1980); *Ex parte Nichols*, 604 S.W.2d 81, 82 (Tex. Crim.App.1980); *Almand v. State*, 536 S.W.2d 377, 379 (Tex.Crim.App.1976); *McKinney v. State*, 505 S.W.2d 536, 541 (Tex.Crim.App. 1974); *Jackson v. State*, 494 S.W.2d 550 (Tex. Crim.App.1973); *Ford v. State*, 488 S.W.2d 793, 795 (Tex.Crim.App.1972); *Doby v. State*, 454 S.W.2d 411, 413–14 (Tex.Crim.App. 1970); *Watts v. State*, 430 S.W.2d 200, 202 (Tex.Crim.App.1968); *Holcombe v. State*, 424 S.W.2d 635, 637 (Tex.Crim.App.1968); *Melancon v. State*, 367 S.W.2d 690, 692 (Tex. Crim.App.1963); *Dillard v. State*, 153 Tex. Crim. 134, 218 S.W.2d 476, 478 (1949); *McDonald v. State*, 138 Tex.Crim. 510, 136 S.W.2d 816, 818 (1940).

Coke has waived any claim that their laws and our laws are not the same.

That is, until today. Although Rule 202 says a court *shall* take judicial notice upon request and *may* do so on its own motion, the Court now says that choice-of-law is jurisdictional (at least sometimes) so trial courts *must* analyze it in *every* case. If they do not, appellate courts may not bother looking for conflicts either (though Rule 202 appears to allow it)[14] and simply presume they are different. Not only does this reverse dozens of our own cases and our own rules of evidence, it allows appellate judges to dismiss jury verdicts on appeal—without notice or argument—whenever they think verdicts "dictate to other states what can and cannot be tolerated."[15]

In this case, the Court's new presumption turns out to be wrong. There is a very good reason why Coke never offered the laws of any other state at trial or on appeal: they all look alike. This is not surprising because most state antitrust laws are patterned on federal antitrust laws,[16] as the laws applicable here show:

**Federal law:**

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.... Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony.... [17]

**Texas law:**

Every contract, combination, or conspiracy in restraint of trade or commerce is unlawful. It is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce.[18]

**Louisiana law:**

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in this state is illegal. No person shall monopolize, or attempt to monopolize, or combine, or conspire with any other person to monopolize any part of the trade or commerce within this state.[19]

**Oklahoma law:**

Every act, agreement, contract, or combination in the form of a trust, or otherwise, or conspiracy in restraint of trade or commerce within this state is hereby declared to be against public policy and illegal. It is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce in a relevant market within this state.[20]

Despite these manifest similarities, the Court says we cannot presume that our neighbors' laws are the same as our own because then we would have to presume

---

14. *See* TEX.R. EVID. 202 (noting that judicial notice of the laws of other states "may be taken at any stage of the proceeding").

15. 218 S.W.3d at 682.

16. *See* Dorothy M. Allison, *Physician Retaliation: Can the Physician–Patient Reltionship Be Protected?*, 94 DICK. L. REV. 965, 979 n. 122 (1990) (noting that "[s]tate antitrust laws are usually patterned after the federal statute," and citing the Texas statute as an example).

17. 15 U.S.C. §§ 1, 2.

18. TEX. BUS. & COM.CODE § 15.05(a)-(b).

19. LA.REV.STAT. §§ 51:122(A), 51:123.

20. 79 OKLA. STAT. tit. 79 § 203(A)-(B).

that their laws were intended to protect competition *in Texas,* as our laws are. This is both unprecedented and unfair. Texas law—from abandonment to zoning— is generally intended to govern affairs in Texas; if the historic presumption required a showing that our sister states also intended to govern such affairs in Texas, it would *never* have been used. It is one thing to presume Texas laws are limited to Texas, but quite another to presume foreign laws are limited to Texas too.

The Court justifies all this on the basis that interstate comity requires abstention. "When there is parallel state and federal litigation ... [c]omity or abstention doctrines may, in various circumstances, permit or require the federal court to stay or dismiss the federal action in favor of the state-court litigation." [21] But we have never adopted an "abstention doctrine" for disputes that cross state lines, and for several reasons should not start now.

First, we are not federal courts, and there is no parallel state litigation. Texas courts have generally considered comity only when there is a conflict between litigation in our courts and litigation elsewhere.[22] There is no such conflict here.

Second, federal abstention applies only to "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case ..." [23] Until today, we have not hesitated to decide cases concerning robbery,[24] income taxes,[25] alimony,[26] and child custody [27] on the presumption that a sister state's laws were the same as our own. And at least two Texas courts have done so in antitrust cases,[28] even if the parties did not cite to them. But now, unaccountably, soft drink sales present a policy problem of such "substantial public import" that no Texas court is competent to consider them. As the common law and common cases often "reflect fundamental policy choices," [29] it is unclear after today's decision what other claims against Texas residents cannot be brought in Texas courts.

Third, today's decision is inconsistent with federal law. The Sherman Act does not apply to conduct affecting only foreign markets because Congress passed a specif-

**21.** *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 292, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005).

**22.** *See, e.g., Bryant v. United Shortline Inc. Assurance Services, N.A.,* 972 S.W.2d 26, 30–31 (Tex.1998) (holding comity did not require Texas courts to defer to Tennessee litigation); *Christensen v. Integrity Ins. Co.,* 719 S.W.2d 161, 163 (Tex.1986) (holding comity prevented Texas court from enjoining similar California litigation); *Gannon v. Payne,* 706 S.W.2d 304, 307 (Tex.1986) (holding comity prevented Texas court from enjoining related Canadian litigation).

**23.** *Colorado River Water Conservation Dist. v. U.S.,* 424 U.S. 800, 814, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).

**24.** *See State v. Thomasson,* 154 Tex. 151, 275 S.W.2d 463, 464 (1955).

**25.** *See Massachusetts v. Davis,* 140 Tex. 398, 168 S.W.2d 216, 220 (1942).

**26.** *See Rivera v. White,* 94 Tex. 538, 63 S.W. 125, 126 (1901).

**27.** *See Ogletree v. Crates,* 363 S.W.2d 431, 435 (Tex.1963).

**28.** *See Byrd v. Crazy Water Co.,* 140 S.W.2d 334, 336 (Tex.Civ.App.-Dallas 1940, no writ) (presuming antitrust laws of California the same as those of Texas); *J.R. Watkins Co. v. McMullan,* 6 S.W.2d 823, 824 (Tex.Civ.App.-Austin 1928, no writ) (presuming antitrust laws of Oklahoma the same as those of Texas).

**29.** *See* 218 S.W.3d at 681.

ic amendment saying so,[30] something the Texas Legislature has not done. The federal amendment was required so American businesses could compete in foreign markets, many of which allow price-fixing, monopolizing, and so on,[31] which interstate commerce does not. And the Supreme Court has specifically held that applying American antitrust law extraterritorially is not a jurisdictional problem,[32] and that American courts should defer to foreign antitrust laws only in cases of an unavoidable conflict.[33] We are supposed to construe Texas antitrust laws "in harmony with federal judicial interpretations," [34] but today the Court calls its own tune.

Finally, and perhaps most important, the Texas antitrust statute specifically precludes judicial abstention. The statute plainly applies to "trade and commerce occurring wholly or partly within the State of Texas," [35] and the Legislature stated in no uncertain terms that it intended Texas antitrust laws to govern commerce crossing state lines to the absolute limit of constitutional law:

> No suit under this Act shall be barred on the grounds that the activity or conduct complained of in any way affects or involves interstate or foreign commerce. It is the intent of the legislature to exercise its powers to the full extent consistent with the constitutions of the State of Texas and the United States.[36]

Because neither Coke nor the Court suggests that the judgment here is unconstitutional, we cannot prudentially abstain from deciding this case without ignoring the Legislature's express intent.

On occasion, comity and choice of law may suggest that a Texas court should dismiss a claim in favor of a foreign forum under principles of forum non conveniens.[37] But that is a matter of venue rather than jurisdiction,[38] and thus is waived if never requested. Moreover, other public and private interest factors must be balanced in that decision, factors that Coke never addresses. We should not re-

---

**30.** *See* 15 U.S.C. § 6a (providing that Sherman Act shall not apply to foreign trade except for claims arising from conduct with a direct, substantial, and reasonably foreseeable effect on American imports or internal commerce).

**31.** *See* Kevin O'Malley, Notes & Comments, *Does U.S. Antitrust Jurisdiction Extend to Claims of Independent/Dependent Foreign Injury?*, 20 TEMP. INT'L & COMP. L.J. 219, 239 (2006) (noting § 6a was intended to encourage American businesses to compete in foreign markets by means that, although illegal here, were lawful there).

**32.** *See Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 795–96, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993).

**33.** *See id.* at 798–99, 113 S.Ct. 2891 (holding that foreign insurers actions, although legal under British law, could be sued under Sherman Act in American courts because insurers could have complied with the laws of both countries).

**34.** TEX. BUS. & COM.CODE § 15.04; *see Abbott Lab., Inc. v. Segura*, 907 S.W.2d 503, 505 (Tex.1995).

**35.** TEX. BUS. & COM.CODE § 15.04.

**36.** *Id.* § 15.25(b).

**37.** *See Gulf Oil v. Gilbert*, 330 U.S. 501, 508–09, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); *Flaiz v. Moore*, 359 S.W.2d 872, 875 (Tex.1962); *see also* TEX. CIV. PRAC. & REM.CODE § 71.051.

**38.** *See Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 722, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996) ("The dispute in *Gulf Oil* was over venue, not jurisdiction ..."); *Am. Dredging Co. v. Miller*, 510 U.S. 443, 453, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994) ("At bottom, the doctrine of forum non conveniens is nothing more or less than a supervening venue provision ...").

duce a doctrine this old to two factors favoring one party.

Nor should we make antitrust law inefficient, as its goal is the opposite. If state antitrust laws are a jurisdictional matter, separate suits will have to be brought in each state, even if (as here) they involve the same contracts, the same conduct, and the same parties. And no state court will have jurisdiction if a market straddles a state line, as many do.

The Court suggests that the bottlers should have filed in federal court. But Texas federal courts use the same jurors, identical statutes, and the same federal caselaw as do Texas state courts; it is hard to see why one imposes on our sister states any more than the other. Of course, federal courts can impose federal law across state lines, but the question here is who can impose Arkansas or Louisiana law on a Texas business; it is hard to see why federal courts are more qualified to do that. Moreover, federal courts already have exclusive jurisdiction of federal antitrust claims;[39] if they also have exclusive jurisdiction of most state antitrust claims, it is hard to see why so many state legislatures went to the trouble.

The Ark–La–Tex region is not a legal no-man's-land; *some* law must apply even if Texas law does not. Coke may not escape liability by merely objecting to the application of Texas law; it had the burden of proving a conflict of laws that prevented the application of Texas law. By failing to do so, it waived any choice-of-law complaint.

## II. Coke's Conduct is not Legal

The Court renders judgment against the bottlers despite the jury's verdict to the contrary, holding they did not prove Coke harmed competition rather than its competitors. But several of Coke's activities in the Ark–La–Tex market were so anticompetitive that federal courts would not require such proof, and we should not either.

On its face, Texas law (like the Sherman Act) prohibits all monopolies and agreements in restraint of trade. But consistent with federal law, the Texas Act was intended to outlaw only unreasonable restraints or illegal monopolization.[40] As a result, most claims under the Act should be analyzed under a "rule of reason" that takes into account the relevant market and industry conditions before and after the restraint, and the history, nature, and effect of the defendant's conduct.[41]

But some restraints are so anticompetitive and unjustifiable that they are deemed unlawful per se, and require no proof that competition has been harmed in a particular case.[42] "[W]hen a particular concerted activity entails an obvious risk of anticompetitive impact with no apparent potentially redeeming value, the fact that a practice may turn out to be harmless in a particular set of circumstances will not prevent its being declared unlawful per se."[43] In

**39.** *See Marrese v. Am. Acad. of Orthopaedic Surgeons,* 470 U.S. 373, 379, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985) (noting that "federal antitrust claims are within the exclusive jurisdiction of the federal courts …").

**40.** *See State Oil Co. v. Khan,* 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997); *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 680 (Tex.1990).

**41.** *See State Oil,* 522 U.S. at 10, 118 S.Ct. 275.

**42.** *See id.; NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 133, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998); *N. Pac. Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

**43.** *Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643, 649, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980).

such cases, "no elaborate study of the industry is needed to establish their illegality." [44] "Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, division of markets, group boycotts, and tying arrangements." [45]

I agree with the Court that Coke did not violate antitrust laws by paying for prime locations in retail stores, or shelf space equal to its market share. Such deals are commonplace, and antitrust law does not require Coke to assist its competitors.[46] There was no evidence here that the bottlers ever tried to purchase prime locations, or that they would have failed had they done so. These claims were subject to a rule-of-reason analysis, and fail for lack of proof that they affected prices or competition in the market as a whole.[47]

But the jury could have concluded from the evidence that Coke did far more than this. The Court declines to address any per se violations because the bottlers assert only violations under the rule of reason. But these are not separate causes of action; they are analytical categories used to decide whether conduct may be presumed to be anticompetitive, or must be shown to be so.[48] Deciding which applies is a question of law for the court,[49] so if the lower courts applied (or the parties argued) the wrong one, we may reverse only if it resulted in an erroneous judgment.[50] Here, the bottlers alleged and the jury found that Coke unreasonably restrained trade and monopolized markets; if there is evidence to support that verdict under either per-se or rule-of-reason analysis, we could not ignore it even if the bottlers had filed no briefs at all.

## A. Price Fixing

In some markets in the Ark–La–Tex region, Coke required that retailers price all other soft drinks higher than its own. Indeed, Coke sometimes specified that competing products had to be priced at least 30¢ higher than Coke's. Coke could lower its prices to beat the competition, but paying retailers to raise its competitors' prices is price-fixing, pure and simple, and it has been illegal for a long time.

For many years, all price-fixing agreements were deemed unlawful per se.[51] Indeed, they were the "archetypal example" of a practice without redeeming competi-

**44.** *Texaco Inc. v. Dagher,* 547 U.S. 1, ——, 126 S.Ct. 1276, 1279, 164 L.Ed.2d 1 (2006) (citations omitted).

**45.** *N. Pac.,* 356 U.S. at 5, 78 S.Ct. 514 (citations omitted).

**46.** *See Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 411, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004).

**47.** *See DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 688 (Tex.1990) ("To establish a violation under the rule of reason, one must prove that the agreement has an adverse effect on competition in the relevant market.").

**48.** *See F.T.C. v. Superior Court Trial Lawyers Ass'n,* 493 U.S. 411, 433, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990); *Arizona v. Maricopa County Med. Soc'y,* 457 U.S. 332, 344, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982); *Nat'l Soc'y of Prof'l Engineers v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978).

**49.** *See F.T.C.,* 493 U.S. at 433, 110 S.Ct. 768.

**50.** *See BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 794 (Tex.2002) ("If the reviewing court determines a conclusion of law is erroneous, but the trial court rendered the proper judgment, the erroneous conclusion of law does not require reversal.").

**51.** *Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643, 647, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980) ("It has long been settled that an agreement to fix prices is unlawful per se.").

tive value.[52]

In 1997 the Supreme Court made an exception for vertical[53] agreements fixing maximum prices, subjecting them to a rule-of-reason analysis.[54] As the Court noted, a price ceiling keeps consumer prices low, and thus does not generally threaten competition.[55] But a price floor keeps prices artificially high, and so remains illegal per se.[56] Because Coke's contracts fixed minimum prices, there is no question they fall in the latter category.

Coke argues there was no evidence that all soft drink prices in the Ark–La–Tex region increased. But while the bottlers presented contrary evidence (which we must presume the jury credited), the main problem is that Coke's agreements were illegal even if they lowered prices, as it is no defense to price-fixing that the prices fixed were reasonable.[57]

Coke also argues that price-fixing is not illegal without a specified resale price. But agreement on a specific price is not required; an agreement that sets a floor

on prices is illegal per se even if that floor sometimes varies.[58]

It can be argued that fixing minimum prices is sometimes procompetitive, as when a supplier wants dealers to furnish services they could not afford without a guaranteed margin.[59] But there is no evidence this is the case with soft drinks; moreover, Coke's agreements sought to control not its own prices but those of its competitors. As the sole purpose of these agreements was to keep the price of all competing soft drinks higher than they otherwise would have been, they were illegal per se.

## B. Boycott

In a number of its agreements with convenience stores, Coke gave retailers a discount on best-selling drinks if retailers promised not to carry competitors to its new root beer, orange, and grape drinks. This is a boycott.[60] There was evidence a jury could credit (and we must presume they did) that once Coke obtained an exclusive-flavor agreement, it typically raised its prices. This is anticompetitive.

---

52. *Id.*

53. "Horizontal" agreements are generally those among competitors, while "vertical" agreements are those between firms at different levels of distribution, such as a supplier and customer. *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 136, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998); *Bus. Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 730, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988).

54. *State Oil Co. v. Khan*, 522 U.S. 3, 17–18, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997).

55. *Id.* at 15, 118 S.Ct. 275.

56. *Id.* (noting that "arrangements to fix minimum prices ... remain illegal *per se*"); *see also Texaco Inc. v. Dagher*, 547 U.S. 1, ——, 126 S.Ct. 1276, 1279, 164 L.Ed.2d 1 (2006) ("[H]orizontal price-fixing agreements fall into the category of arrangements that are *per se* unlawful.").

57. *Id.; Catalano,* 466 U.S. at 647, 104 S.Ct. 2013.

58. *See United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 223, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (holding agreement among competitors to buy gasoline on the spot market to prevent prices from falling sharply was per se unlawful, even though there was no direct agreement on the actual prices to be maintained).

59. *See, e.g., Khan v. State Oil Co.,* 93 F.3d 1358, 1361–62 (C.A.7th 1996), *vacated,* 522 U.S. 3, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997).

60. *See Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 802–03, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) (defining boycott as refusing to deal in one transaction as means of leverage in unrelated transaction).

Some boycotts are illegal per se, while others are subject to a rule-of-reason analysis. Generally, when boycotts (1) cut off access to "a market necessary to enable the boycotted firm to compete," (2) are orchestrated by a firm with "[a] dominant position in the relevant market," and (3) "are not justified by plausible arguments" of efficiency or competition, then a per se rule applies.[61] On the evidence introduced at trial, reasonable jurors could have concluded that Coke met all three requirements.

Generally, only horizontal boycotts are illegal per se, as a single customer may always choose to change suppliers (or vice versa).[62] But horizontal agreements need not be instigated by competitors; they can be imposed by dominant firms above or below them. Thus, for example, when a retailer persuaded its 10 manufacturers not to sell to the retailer's small competitor, the Supreme Court used a per se analysis, rejecting as a matter of law a defense that the boycott did not hurt competition but only one competitor.[63] Similarly, when a group of stores persuaded dress designers and manufacturers not to deal with stores carrying competing designs, the Supreme Court used a per se analysis, refusing to consider evidence that the boycott was reasonable and procompetitive.[64]

Even if Coke's conduct were considered a vertical boycott and the rule of reason applied, no elaborate industry analysis would be required to demonstrate the anticompetitive nature of these agreements. "Absent some countervailing procompetitive virtue ... an agreement limiting consumer choice by impeding the 'ordinary give and take of the market place,' cannot be sustained under the Rule of Reason."[65] There may be good business reasons to limit soft drink brands in airplane cabins or fast-food franchises, but there is no evidence that is true of the supermarkets and convenience stores here. While businesses may generally make vertical agreements about whose products to carry without proffering a business reason, a monopolist like Coke cannot impose such a regime when it makes "an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years."[66] Coke advances no credible argument for the proposition that giving consumers fewer choices enhanced competition.[67]

**61.** See Northwest Wholesale Stationers Inc. v. Pac. Stationery, 472 U.S. 284, 294, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985); see also F.T.C. v. Indiana Fed'n of Dentists, 476 U.S. 447, 458, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) ("[T]he per se approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor.").

**62.** See NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 136–37, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998).

**63.** See Klor's, Inc. v. Broadway–Hale Stores, Inc., 359 U.S. 207, 209–10, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).

**64.** See Fashion Originators' Guild of Am., Inc. v. F.T.C., 312 U.S. 457, 467–68, 61 S.Ct. 703, 85 L.Ed. 949 (1941).

**65.** F.T.C. v. Indiana Fed'n of Dentists, 476 U.S. 447, 459, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) (citations omitted).

**66.** Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 603, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985).

**67.** See Indiana Fed'n of Dentists, 476 U.S. at 459, 106 S.Ct. 2009 (finding dentists' agreement to refuse x-rays to patients' insurers had no procompetitive justification and failed rule of reason test).

## C. Advertising Ban

In many of Coke's agreements, retailers had to agree not to advertise any other soft drinks—inside and or outside the store, in circulars, banners, or signs of any kind, or even signs that merely stated the price.

This ban too is illegal per se: "[a] concerted and effective effort to withhold (or make more costly) information desired by consumers for the purpose of determining whether a particular purchase is cost justified is likely enough to disrupt the proper functioning of the price-setting mechanism of the market that it may be condemned even absent proof that it resulted in higher prices." [68] There is an exception for bans on price-advertising for professional services, which are subject to rule-of-reason analysis because consumers do not have the expertise to compare the quality of services offered.[69] But that, of course, is not the case with soft drinks.

Coke's only proffered justification for the ban on advertising is that it did not want a competitor's ads covering up its own. In the first place, some of the ads banned (such as newspaper ads and in-store circulars) were paid for by the retailers, not Coke. Moreover, Coke's agreements did not demand that its ads be merely the first or the largest or the most visible ads, but the *only* ads. It is hard to imagine any procompetitive reason for banning competing ads, and Coke does not offer any.

## D. Monopoly

Finally, Coke argues that with the exception of the advertising ban, the above activities were isolated practices in a few markets involving a few brands for short periods of time. But a monopolist cannot corner the market illegally by doing so a little bit at a time.

Under the Texas Act, like the Sherman Act, a monopoly claim has two elements: (1) monopoly power in the relevant market and (2) willful acquisition, maintenance, or use of that power by predatory means or for predatory purposes.[70] As Coke did not contest the first, we review the record only for the second.

The Coke distributor here is an international corporation accounting for 77 percent of Coke's worldwide sales. It does not contest that its 75–80 percent market share gave it monopoly power in the Ark–La–Tex region.[71] It required agreements from every retailer in the region except Wal–Mart, and the jury could have credited evidence that it punished retailers who refused with prohibitive wholesale prices. Unlike similar agreements in other parts of the country, Coke's agreements in the Ark–La–Tex region were perennial, covering 80 to 100 percent of every year, and extended annually. As Coke concedes, these "special" marketing agreements were unlike those that it used in the rest of the nation, or those that have been

**68.** *Id.* at 461–62, 106 S.Ct. 2009.

**69.** *See California Dental Ass'n v. F.T.C.,* 526 U.S. 756, 771–72, 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999).

**70.** *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 407, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004); *Aspen Skiing Co.,* 472 U.S. at 602, 105 S.Ct. 2847; *Caller–Times Publ'g Co. v. Triad Communications, Inc.,* 826 S.W.2d 576, 580 (Tex. 1992).

**71.** *See, e.g., Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (holding evidence that defendant controlled 80 to 95 percent of relevant market created fact issue for jury as to monopoly power).

approved by other courts.[72] These facts, plus the nature of the agreements noted above, are sufficient to support a jury verdict of monopolization.[73]

It was neither necessary nor sufficient for the bottlers to show that Coke charged monopoly prices. Monopoly pricing is not illegal; indeed, it plays an important role in competition, initially by inducing innovation, and later by attracting new competitors.[74] Illegal monopolization may exist "even though a combination may temporarily or even permanently reduce the price of the articles manufactured or sold." [75]

Nor did the bottlers have to declare bankruptcy to prove their monopolization claim.[76] Instead, they only had to prove that Coke's practices adversely affected competition without a legitimate business justification.[77] That they did.

Even under a rule-of-reason analysis, it would not be up to us to decide whether Coke's agreements were predatory. As we are reviewing a jury verdict, we must interpret the entire record in the light most favorable to the bottlers and give them the benefit of all inferences the evidence fairly supports.[78] "[T]he primary purpose of the antitrust laws is to protect interbrand competition." [79] Even if soft drink sales grew overall, agreements expressly intended to raise prices and reduce consumer choices harm competition.[80] Ju-

**72.** See RJ Reynolds Tobacco Co. v. Philip Morris USA Inc., 67 Fed. Appx. 810, 811–12 (4th Cir.2003), aff'g 199 F.Supp.2d 362, 397 (M.D.N.C.2002) (upholding agreement that granted supplier best display areas, but did not forbid other products, displays, or competitive pricing); Bayou Bottling Inc. v. Dr. Pepper Co., 725 F.2d 300, 304 (5th Cir.1984) (upholding agreement offering free maintenance on retailer's machines if stocked only with defendants' products); El Aguila Food Products Inc. v. Gruma Corp., 301 F.Supp.2d 612, 631–32 (S.D.Tex.2003) (upholding marketing agreement by supplier without market power); Louisa Coca–Cola Bottling Co. v. Pepsi–Cola Metro. Bottling Co., 94 F.Supp.2d 804, 815–16 (E.D.Ky.1999) (upholding non-exclusive marketing agreement); Frito–Lay, Inc. v. Bachman Co., 659 F.Supp. 1129, 1134 (S.D.N.Y.1986) (upholding 17–week agreement that guaranteed supplier shelf space equal to its market share); Beverage Mgmt., Inc. v. Coca–Cola Bottling Corp., 653 F.Supp. 1144, 1157–58 (S.D.Ohio 1986) (upholding agreement that granted supplier without market power exclusive ads for half of year).

**73.** Eastman Kodak Co., 504 U.S. at 482–83, 112 S.Ct. 2072; Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 610–11, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985); see also Am. Tobacco Co. v. United States, 328 U.S. 781, 810, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946) ("Neither proof of exertion of the power to exclude nor proof of actual exclusion of existing or potential competitors is essential

to sustain a charge of monopolization under the Sherman Act.").

**74.** See Verizon Communications, 540 U.S. at 407, 124 S.Ct. 872.

**75.** Fashion Originators' Guild of Am., Inc. v. F.T.C., 312 U.S. 457, 467, 312 U.S. 668, 61 S.Ct. 703, 85 L.Ed. 949 (1941).

**76.** See Lorain Journal Co. v. United States, 342 U.S. 143, 153, 72 S.Ct. 181, 96 L.Ed. 162 (1951).

**77.** See Aspen Skiing Co., 472 U.S. at 607–610, 105 S.Ct. 2847 (affirming jury verdict based on evidence that consumers complained about discontinuation of multi-mountain lift tickets, and absence of legitimate business justification for the decision).

**78.** Id. at 604, 105 S.Ct. 2847.

**79.** State Oil Co. v. Khan, 522 U.S. 3, 15, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997); see also Volvo Trucks N. Am., Inc. v. Reeder–Simco GMC, Inc., 546 U.S. 164, 126 S.Ct. 860, 872, 163 L.Ed.2d 663 (2006).

**80.** See Conwood Co., L.P. v. U.S. Tobacco Co., 290 F.3d 768, 789 (6th Cir.2002) ("Thus, although [sales] in the moist snuff market grew, there was evidence showing that [the defendant's] actions caused higher prices and re-

rors were entitled to conclude that Coke's agreements were, in several respects, intended to accomplish just that.

Evidence of perfectly legitimate conduct is no evidence of an antitrust violation.[81] Like federal law, Texas law does not give jurors *"carte blanche* to insist that a monopolist alter its way of doing business whenever some other approach might yield greater competition."[82] But if a dominant competitor can use its market power to control its competitors' prices, advertising, and access to consumers—as the Court holds they can—it is hard to see what is left of Texas antitrust law.

### E. Damages

The jury found that the bottlers' damages totaled $5,153,898.80. Coke argues this figure is inflated because the bottlers did not segregate damages attributable to Coke rather than Pepsi (with whom they settled). Further, Coke argues that by simply assuming the bottlers' sales would have grown at the national average for all soft drinks, it was required to compensate the bottlers not only for illegal conduct, but also for legal conduct or anything else

that caused their sales to grow less than the national average.

The United States Supreme Court has said little about calculating damages in antitrust cases, except that verdicts should not be based on speculation or guesswork,[83] that defendants should not profit because their own wrongs prevent a more precise computation,[84] and that plaintiffs may use estimates and analyses to calculate a reasonable approximation of damages.[85] As it may be impossible to prove what markets would have done absent illegal conduct, several federal circuit cases do not require a showing of the harm caused by individual acts.[86] And in at least one case, lost profits were awarded on the assumption that national sales trends would have applied locally.[87]

But the problem here is that much of the conduct the bottlers emphasized at trial—Coke's discounts for favorable shelf and display locations—was not illegal at all. By mixing valid and invalid elements of damages in a single award over Coke's objection, we cannot tell whether the jury based its award on legal or illegal conduct.[88] When the damages evidence included both proper and improper items,

---

duced consumer choice, both of which are harmful to competition.'').

**81.** *See Bus. Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 726, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988) (holding antitrust evidentiary standard should not "deter or penalize perfectly legitimate conduct").

**82.** *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 415–16, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004).

**83.** *See Bigelow v. RKO Radio Pictures Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946).

**84.** *See id.*

**85.** *See Eastman Kodak Co. of New York v. S. Photo Materials Co.*, 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684 (1927).

**86.** *See, e.g., New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 88–89 (2d Cir.2000); *Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 435–38 (5th Cir.1985); *Lehrman v. Gulf Oil Corp.*, 464 F.2d 26, 32 (5th Cir.1972).

**87.** *See Bob Willow Motors, Inc. v. Gen. Motors Corp.*, 872 F.2d 788, 798 (7th Cir.1989).

**88.** *See Harris County v. Smith*, 96 S.W.3d 230, 234 (Tex.2002); *accord, Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 200–01 (1st Cir.1996) (holding reversal of monopolization claim required new trial on damages from price-discrimination claim).

remand is required to allow segregation of the two.[89]

## III. Conclusion

Unlike most other statutes, the antitrust laws are like the common law in that "varying times and circumstances" may give them "changing content."[90] Although Texas has had its own antitrust statutes since 1889, the Legislature adopted the current law in 1983 to give Texas courts broader powers and greater flexibility in addressing new economic and business conditions.[91] We have addressed the amended law only rarely, and never found a violation of it.[92] It is a shame the Court does so again today, allowing a monopolist to fix prices, ban consumer ads, and remove competing products.

Because higher prices and fewer choices injured competition in the Ark–La–Tex region, not just Coke's competitors, I would remand for the bottlers to establish their damages. Because the Court does not, I respectfully dissent.

---

**89.** *See Smith,* 96 S.W.3d at 236; *Minnesota Mining and Mfg. Co. v. Nishika Ltd.,* 953 S.W.2d 733, 739 (Tex.1997); *Texarkana Mem'l Hosp., Inc. v. Murdock,* 946 S.W.2d 836, 841 (Tex.1997); *Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 10–12 (Tex.1991).

**90.** *Bus. Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717, 731, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988).

**91.** *See Caller–Times Publ'g Co. v. Triad Communications, Inc.,* 826 S.W.2d 576, 580 (Tex. 1992).

**92.** *See Abbott Laboratories, Inc. v. Segura,* 907 S.W.2d 503, 507 (Tex.1995); *Caller–Times,* 826 S.W.2d at 588; *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 688 (Tex.1990).